CASE NO. 23-13119-H

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

**CITY OF DAYTONA BEACH, FLA.,**

    Appellant,

-vs-

**DENNIS SCOTT, CHAD DRIGGERS,
DOUGLAS WILLIS, and
GEORGE ROWLAND,**

    Appellees,

# <u>APPELLANT'S INITIAL BRIEF</u>

ON APPEAL FROM AN ORDER GRANTING
PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION
MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION
THE HONORABLE WENDY W. BERGER
6:22-cv-2192-WWB-RMN

Michael H. Kahn, Esquire
MICHAEL KAHN, P.A.
Florida Bar No.: 0241921
482 N. Harbor City Blvd.
Melbourne, FL 32935
(321) 242-2564
Michael@michaelkahnpa.com

*Attorney for Appellant*

IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

City of Daytona Beach, Fla. v. Scott, et al.          Case No. 23-13119-H

## **CERTIFICATE OF INTERESTED PERSONS**
## **AND CORPORATE DISCLOSURE STATEMENT**

11th Cir. R. 26.1 requires that a Certificate of Interested Persons and Corporate Disclosure Statement be included with each brief, petition, answer, motion or response filed by any party.

Listed below are the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case:

1.     Berger, Hon. Wendy W., *U.S. District Judge*

2.     City of Daytona Beach, Fla., *Defendant / Appellant*

3.     Clarke, Kristen, *Assistant Attorney General, United States Department of Justice, Special Litigation Section, Civil Rights Division*

4.     Driggers, Chad, *Plaintiff / Appellee*

5.     Dunn, Chelsea, *Attorney for Plaintiffs / Appellees*

6.     Gross, Benjamin, *City Attorney for Appellant City of Daytona Beach, Fla.*

C-1 of 3

7.      Johnston, Maureen, *Acting Deputy Chief, United States Department of Justice, Special Litigation Section, Civil Rights Division*

8.      Kahn, Michael, *Attorney for Defendant / Appellant*

9.      Marshall, Daniel, *Attorney for Plaintiffs / Appellees*

10.     Michael Kahn, P.A., *Attorney for Defendant / Appellant*

11.     Neelakanta, Sabarish P., *Attorney for Plaintiffs / Appellees*

12.     Norway, Hon. Robert M., *Magistrate Judge*

13.     Rosenbaum, Steven H., *Section Chief, United States Department of Justice, Special Litigation Section, Civil Rights Division*

14.     Rowland, George, *Plaintiff / Appellee*

15.     Scott, Dennis, *Plaintiff / Appellee*

16.     Siegel, Jodi, *Attorney for Plaintiffs / Appellees*

17.     Southern Legal Counsel, Inc., *Attorneys for Plaintiffs / Appellees*

18.     SPN Law LLC, *Attorney for Plaintiffs / Appellees*

19.     United States Department of Justice

20.     Van Erem, Haley, *Trial Attorney, United States Department of Justice, Special Litigation Section, Civil Rights Division*

21.     Willis, Douglas, *Plaintiff / Appellee*

No publicly traded company has an interest in the outcome of this case or appeal.

C-2 of 3

By:    /s/ Michael H. Kahn
       Michael H. Kahn, Esquire
       Florida Bar No.: 0241921
       Counsel for Appellant / Defendant

# STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument for this appeal. This case involves a historically common subject of regulation by local governments - panhandling - but in a rapidly evolving legal context. In particular, the Supreme Court's recent decision in <u>City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC</u>, 596 U.S. 61 (2022) (sometimes hereinafter "<u>Austin</u>") dramatically changed the legal landscape in which such challenges are to be evaluated. Whether panhandling laws are treated as content-based or content-neutral post-<u>Austin</u> is a case of first impression before this Court. Appellant also asserts that its panhandling law can survive strict scrutiny if that standard is deemed to apply. Local governments have rarely defended their laws by directly addressing the ruling in <u>Reed v. Gilbert</u>, 576 U.S. 155 (2015) (sometimes hereinafter "<u>Reed</u>"), while asserting the effect of <u>Austin</u> on <u>Reed</u> and contending that their ordinance ("Ordinance") is not content based and, thus, requires the lesser standard of intermediate review. Therefore, there is a corresponding dearth of appellate decisions applying this analysis.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-xii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . 2-7

    A.    Course of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5

    B.    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7

    C.    Statement of the Standard of Review . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-53

I.    THE PRELIMINARY INJUNCTION ORDER FAILED TO CORRECTLY
    ANALYZE DAYTONA BEACH'S SOLICITATION ORDINANCE
    UNDER THE STANDARD IN CITY OF AUSTIN, TEXAS V. REAGAN
    NAT'L ADVERT. OF AUSTIN, LLC, 596 U.S. 61 (2022), WHICH
    ALLOWS FOR REGULATION OF SOLICITATIONS, PROVIDED ONLY
    THAT THEY DO NOT DISCRIMINATE ON THE BASIS OF TOPIC,
    SUBJECT MATTER OR VIEWPOINT. . . . . . . . . . . . . . . . . . . . . . . . . . 9-47

A.    Daytona Beach's Solicitation Ordinance does not Discriminate on the Basis of Topic, Subject Matter or Viewpoint ....................................................................... 20-27

B.    Daytona Beach's Solicitation Ordinance Survives Review under Intermediate Scrutiny ................................... 27-38

C.    Even if Daytona Beach's Solicitation Ordinance is Content-Based, it Survives Strict Scrutiny Given the Compelling Government Interests Asserted and the Narrowness of the Regulation .......................................................................... 38-45

D.    The Equities Favor the Maintenance of Daytona Beach's Solicitation Ordinance Given the Vital Public Interest in Regulation and Considering the Likelihood that Plaintiffs' Constitutional Claims will Not Succeed when Reviewed under City of Austin ........................................................... 45-47

II.    THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO CONDUCT AN EVIDENTIARY HEARING ............................................ 47-53

CONCLUSION ....................................................................................... 53-54

CERTIFICATE OF COMPLIANCE .......................................................... 55

CERTIFICATE OF SERVICE ................................................................... 55

iii

# <u>**TABLE OF CITATIONS**</u>

<u>CASES</u>                                                                                                <u>Page</u>

<u>7020 Ent., LLC v. Miami-Dade Cnty.</u>,

    519 F. Supp. 3d 1094 (S.D. Fla. 2021)................................................. 42

<u>Adarand Constructors, Inc. v. Pena</u>,

    515 U.S. 200 (1995) ............................................................................ 39

<u>All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.</u>,

    887 F.2d 1535 (11th Cir. 1989).......................................................... 49

<u>Americans for Prosperity Found. v. Bonta</u>,

    594 U.S. __, 141 S. Ct. 2373 (2021) ................................................... 44

<u>Baker v. Buckeye Cellulose Corp.</u>,

    856 F.2d 167 (11th Cir. 1988)............................................................ 49

<u>Billups v. City of Charleston, S.C.</u>,

    961 F.3d 673 (4th Cir. 2020).............................................................. 35

<u>Board of Trustees of State Univ. of New York v. Fox</u>,

    492 U.S. 469 (1989) ............................................................................ 32

<u>Buchwald v. Univ. of New Mexico Sch. of Med.</u>,

    159 F.3d 487 (10th Cir. 1998)............................................................ 40

iv

Burson v. Freeman,

    504 U.S. 191 (1992) ............................................................. 39

CBS Broad., Inc. v. EchoStar Communications Corp.,

    265 F.3d 1193 (11th Cir. 2001) .................................................50-51

City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC,

    596 U.S. 61 (2022) ................................................................. *passim*

City of Renton v. Playtime Theatres, Inc.,

    475 U.S. 41 (1986) ............................................................ 27 n. 10, 38

Club Madonna Inc. v. City of Miami Beach,

    42 F.4th 1231 (11th Cir. 2022) .................................................. 27 n. 10

Commerce Park at DFW Freeport v. Mardian Construction Co.,

    729 F.2d 334 (5th Cir. 1984) ............................................................. 50

Curling v. Raffensperger,

    50 F.4th 1114 (11th Cir. 2022) ...............................................................9

Eknes-Tucker v. Governor of Alabama,

    80 F.4th 1205 (11th Cir. 2023) ...............................................................7

FF Cosmetics FL, Inc. v. City of Miami Beach,

    866 F.3d 1290 (11th Cir. 2017) ............................................. 32, 35, 36

Fla. Bar v. Went For It, Inc.,

    515 U.S. 618 (1995) ..…………………………………………..…...31

Florida Atl. Univ. Bd. of Trustees v. Parsont,

    465 F.Supp.3d 1279 (S.D. Fla. 2020) ................................................. 50

Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,

    11 F.4th 1266 (11th Cir. 2021)....................................... 27 n. 10, 36-37

Forts v. Ward,

    566 F.2d 849 (2d Cir. 1977) ............................................................... 49

Gbalazeh v. City of Dallas, Texas,

    No. 3:18-CV-0076-N, 2019 WL 1569345 (N.D. Tex. 2019) ........... 42

Gonzalez v. Governor of Georgia,

    978 F.3d 1266 (11th Cir. 2020)............................................................9

Gresham v. Peterson,

    225 F.3d 899 (7th Cir. 2000)....................................................... 10, 11

Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,

    452 U.S. 640 (1981) ............................................................... 15, 30, 42

Henagan v. City of Lafayette,

    2022 WL 4546721 (W.D. La. Sept. 27, 2022) ................................... 40

Hines v. Pardue,

  __ F.Supp.3d __, 2023 WL 5254673 (S.D. Tex. Aug. 15, 2023) ...... 15

Holder v. Humanitarian Law Project,

  561 U.S. 1 (2010) ................................................................. 39

Homeless Helping Homeless, Inc. v. City of Tampa,

  2016 WL 4162882 (M.D. Fla. 2016) ................................... 40

Int'l Caucus of Lab. Committees v. City of Montgomery,

  111 F.3d 1548 (11th Cir. 1997) .......................................... 31

Jim Gall Auctioneers, Inc. v. City of Coral Gables,

  210 F.3d 1331 (11th Cir. 2000) .......................................... 38

Kirtz v. Trans Union LLC,

  46 F.4th 159 (3d Cir. 2022) ........................................... 25-26

LaCroix v. Town of Fort Myers Beach, Fla.,

  38 F.4th 941 (11th Cir. 2022) .................................... 16 n. 5

Lady J. Lingerie, Inc. v. City of Jacksonville,

  176 F.3d 1358 (11th Cir. 1999) ......................................... 44

Lawrence v. Polis,

  505 F.Supp. 3d 1136 (D. Colo. 2020) ................................ 40

Mazo v. New Jersey Sec'y of State,

    54 F.4th 124 (3d Cir. 2022)
    *cert. denied sub nom*. Mazo v. Way,
    No. 22-1033, 2023 WL 6377826 (U.S. Oct. 2, 2023) ........................ 17

McCullen v. Coakley,

    573 U.S. 464 (2014) ........................................................................... 44

McDonald's Corp. v. Robertson,

    147 F.3d 1301 (11th Cir. 1998) ........................................................ 50

McLaughlin v. Lowell,

    140 F.Supp. 3d 177 (D. Mass. 2015) ................................................ 42

Messer v. City of Douglasville, Ga.,

    975 F.2d 1505 (11th Cir. 1992) ........................................................ 30

Messina v. City of Fort Lauderdale, Fla.,

    546 F.Supp. 3d 1227 (S.D. Fla. 2021) .............................................. 13

Moon v. Med. Tech. Associates, Inc.,

    577 Fed. Appx. 934 (11th Cir. 2014) ................................................ 51

Nat'l Fed'n of the Blind of Texas Inc. v. City of Arlington, Texas,

    No. 3:21-CV-2028-B, 2022 WL 4125094
    (N.D. Tex. Sept. 9, 2022) .......................................................... 23, 24

Norton v. City of Springfield, Ill.,

    768 F.3d 713 (7th Cir. 2014) ............................................................ 12

Norton v. City of Springfield, Ill.,

    806 F.3d 411 (7th Cir. 2015) ...................................................... 12, 13

Porter v. Martinez,

    68 F.4th 429 (9th Cir. 2023) ............................................................ 18

Railroad Comm'n. v. Pullman Co.,

    312 U.S. 496 (1941) ....................................................................... 47

Ranch House, Inc. v. Amerson,

    238 F.3d 1273 (11th Cir. 2001) ...................................................... 37

Reagan Nat'l Advert. of Austin, Inc. v. City of Austin,

    972 F.3d 696 (5th Cir. 2020) .......................................................... 14

Reed v. Town of Gilbert, Ariz.,

    576 U.S. 155 (2015) ............................................................... *passim*

Regents of Univ. of California v. Bakke,

    438 U.S. 265 (1978) ....................................................................... 40

Schneider v. State of New Jersey,

    308 U.S. 147 (1939) .................................................................. 30-31

SEC v. Frank,

    388 F.2d 486 (2d Cir. 1968) ........................................................ 50

Smith v. City of Fort Lauderdale, Fla.,

    177 F.3d 954 (11th Cir. 1999) ............................................. 10, 22 n. 8

Solantic, LLC v. City of Neptune Beach,

    410 F.3d 1250 (11th Cir. 2005) ..................................................... 42

StreetMediaGroup, LLC v. Stockinger,

    79 F.4th 1243 (10th Cir. Aug. 22, 2023) ............................... 21 n. 6, 26

Sturgeon v. Frost,

    __ U.S. __, 139 S. Ct. 1066, 1086 (2019) ......................................... 26

Tanzin v. Tanvir,

    592 U. S. __, 141 S.Ct. 486 (2020) ................................................... 25

Thayer v. City of Worcester,

    755 F.3d 60 (1st Cir. 2014) ....................................................... 12, 13

Thayer v. City of Worcester,

    2017 WL 1190366 (D. Mass. 2017) .......................................... 12, 13

Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres,
More or Less, Over Parcel(s) of Land of Approximately
1.21 Acres, More or Less, Situated in Land Lot 1049,

    910 F.3d 1130 (11th Cir. 2018) .................................................. 7, 46

x

Turner Broad. Sys., Inc. v. F.C.C.,

    512 U.S. 622 (1994) ...................................................................... 32, 36

United States v. Dawson,

    64 F.4th 1227 (11th Cir. 2023) ..................................................... 22 n. 7

U. S. v. O'Brien,

    391 U.S. 367 (1968) ............................................................................. 27

Van Buren v. United States,

    593 U.S. __, 141 S. Ct. 1648 (2021) ................................................... 25

Ward v. Rock Against Racism,

    491 U.S. 781 (1989) ................................................. 12, 27, 27 n. 10, 33

Weinberger v. Romero-Barcelo,

    456 U.S. 305 (1982) ............................................................................. 47

Williams-Yulee v. Fla. Bar,

    575 U.S. 433 (2015) ............................................................. 35 n. 15, 39

CONSTITUTION                                   Page

    U.S. CONST. AMEND. I ................................................................ *passim*

STATUTES                                         Page
    28 U.S.C. § 1292(a)(1) ..................................................................... xiii

RULES                                              Page

Rule 31, Fed.R.App.P. ................................................................ 55

Rule 32(a)(5), Fed.R.App.P. ...................................................... 55

Rule 32(a)(6), Fed.R.App.P. ...................................................... 55

Rule 32(a)(7)(B), Fed.R.App.P. ................................................. 55

Rule 32(a)(7)(B)(iii), Fed.R.App.P. .......................................... 55

Rule 32(f), Fed.R.App.P. ........................................................... 55

11th Cir. Rule 26.1 ........................................................... C-1 of 3

11th Cir. Rule 32-4 ................................................................... 55

ORDINANCES                                                      Page

§ 66-1, Daytona Beach Code ................................................ *passim*

§ 66-1(b), Daytona Beach Code ...................................................  2

§ 66-1(b)(3), Daytona Beach Code .......................................... 21, 25

§ 6-32, Daytona Beach Code .................................................  23 n. 9

§ 82-4, Daytona Beach Code .................................................  23 n. 9

§ 94-8, Daytona Beach Code .................................................  23 n. 9

OTHER SOURCES                                                  Page

Black's Law Dictionary 1677 (11th ed. 2019) ........................ 3, 15, 25

*Panhandling Laws*, The First Amendment Encyclopedia (2017)
https://www.mtsu.edu/first-amendment/article/1215/panhandling
-laws (last accessed 11/21/23) .................................................. 9 n. 2

## **STATEMENT OF JURISDICTION**

This Court has jurisdiction on appeal pursuant to 28 U.S.C. §1292(a)(1), as this is an interlocutory appeal from a District Court Order granting a preliminary injunction.

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

I.    WHETHER THE TRIAL COURT ERRED WHEN IT CONCLUDED THAT DAYTONA BEACH'S SOLICITATION ORDINANCE WAS CONTENT-BASED UNDER <u>REED V. TOWN OF GILBERT, ARIZ.</u>, 576 U.S. 155 (2015) INSTEAD OF APPLYING THE STANDARD FOR SUCH ORDINANCES SET FORTH IN THE MORE RECENT DECISION OF <u>CITY OF AUSTIN, TEXAS V. REAGAN NAT'L ADVERT. OF AUSTIN, LLC</u>, 596 U.S. 61 (2022).

II.   WHETHER DAYTONA BEACH'S SOLICITATION ORDINANCE SURVIVES INTERMEDIATE SCRUTINY.

III.  WHETHER DAYTONA BEACH'S SOLICITATION ORDINANCE CAN SURVIVE STRICT SCRUTINY SHOULD THAT STANDARD APPLY.

IV.   WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO CONDUCT AN EVIDENTIARY HEARING OR ENTERTAIN ORAL ARGUMENT ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

## STATEMENT OF THE CASE

### A.    Course of proceedings and disposition in the Court below

In 2019, the City of Daytona Beach (sometime hereinafter the "City", "Daytona Beach" or "Appellant") enacted § 66-1 (sometimes hereinafter the "Ordinance"), which regulates the time, place, and manner where individuals can engage in "panhandling". (Doc. 20-2). The Ordinance defines "panhandling" to include any solicitation seeking an immediate payment of money or something of value. *See*, § 66-1(b).

On November 28, 2022, Plaintiffs filed suit claiming that § 66-1 is a content-based law which violated their First Amendment right of expression facially and as-applied to them. (Doc. 1). Shortly thereafter, the Plaintiffs moved for a preliminary injunction. (Doc. 8). The Court took no action on the injunction request. Instead, the Court dismissed the Complaint *sua sponte* as a shotgun pleading. (Doc. 34). Plaintiffs filed their Amended Complaint on February 10, 2023 (Doc. 35) and renewed their request for an injunction. (Doc. 39). Plaintiffs requested oral argument on their motion. (Doc. 40). The U.S. Department of Justice filed a Statement of Interest, but did not intervene in the case. (Doc. 26).

Daytona Beach filed its Response to Plaintiffs' Second Motion for Preliminary Injunction on February 28, 2023 (Doc. 44). The City asserted that

§ 66-1 was content-neutral because its application did not turn on the speaker or his speech and all solicitations seeking immediate consideration were subject to its time, place, and manner restrictions. (Doc. 44 at 15-16). Daytona Beach argued that regulations of this kind must be deemed content-neutral under the Supreme Court's recent decision in <u>City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC</u>, 596 U.S. 61 (2022), which modified the standard previously adopted in <u>Reed v. Town of Gilbert, Ariz.</u>, 576 U.S. 155 (2015). The key language from <u>City of Austin</u>, relied on by Appellant below (and in this Brief), is as follows:

> Most relevant here, **the First Amendment allows for regulations of solicitation** - that is, speech "requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." Black's Law Dictionary 1677 (11th ed. 2019). To identify whether speech entails solicitation, one must read or hear it first. Even so, the Court has reasoned that ***restrictions on solicitation are not content based*** and do not inherently present "the potential for becoming a means of suppressing a particular point of view," so long as they do not discriminate based on topic, subject matter, or viewpoint.

<u>Austin</u>, 596 U.S. 6 at 72 (emphasis added) (Doc. 44 at 2).

Daytona Beach argued that § 66-1 was subject to intermediate scrutiny and would survive that level of review because its restrictions did not substantially burden speech, were supported by significant government interests, and were narrowly tailored. (Doc. 44 at 11-17). The City argued in the alternative that § 66-1 could survive strict scrutiny based on compelling government interests (prevention

of disease, prevention of serious injury or death of pedestrians, and pedestrian and traffic safety.) and its concerted effort to utilize the least restrictive means of regulation. (Doc. 44 at 12-18). Appellant submitted as an exhibit to the proceedings its entire legislative record together with affidavits attesting to the key facts supporting its compelling governmental interests. (Doc. 20; Doc. 44-1, 44-2, 44-3, 44-4, 44-5, 44-6, 44-7, 44-8).[1]

The District Court directed the parties to advise whether an evidentiary hearing was required on the Plaintiffs' Second Motion for Preliminary Injunction. (Doc. 41). The parties filed a joint notice in response. (Doc. 45). The Plaintiffs took the position that an evidentiary hearing was not required, but reiterated their request for a one-hour oral argument. (Id.). Daytona Beach asserted that an evidentiary hearing was indispensable given the bitterly disputed facts pertaining to the substantiality of the government's interests and the issue of narrow tailoring. Appellant identified twelve factual categories which required development through live evidence. (Id). The parties subsequently engaged in extensive and, at times, contentious discovery, including depositions which centered on the aforementioned bitterly disputed facts. (Doc. 53, 57, 59, 61, 63, 68, 84, 89, 96).

On August 29, 2023, the District Judge granted Plaintiffs' Second Motion for

---

[1] Appellees agreed to the authenticity of the legislative record. (Doc. 45 at 2).

Preliminary Injunction and enjoined portions of § 66-1 without conducting a hearing of any kind. (Doc. 72).

Daytona Beach filed a timely appeal. (Doc. 74). On September 27, 2023, Appellant filed its Motion to Stay Order on Motion for Preliminary Injunction Pending Appeal with the District Court. (Doc. 76). Appellees filed their Response on October 11, 2023. (Doc. 79). Because the trial Court did not rule on the City's Motion for an extended period of time, Daytona Beach sought a stay in this Court on November 1, 2023. (11th Cir. Doc. 14). The District Court denied the stay on November 20, 2023. (Doc. 105).

**B.**    **Statement of the Facts**

Plaintiffs are persons who regularly engage in panhandling in Daytona Beach and rely on that income for their living. (Doc. 35 at 1; Doc. 39-1; 39-2; 39-3; 39-4; 39-5; 39-6; 39-7). The Plaintiffs allege that they are or have been homeless. The subject panhandling ordinance does not mention homelessness or regulate the experience of being homeless in any way. (Doc. 35 at 1). Plaintiffs claim that § 66-1 is a content-based law on its face because it only regulates solicitations for the immediate donation of money. (Doc. 39 at 4).

Daytona Beach asserted that there were numerous disputed facts at issue below which bore on these central constitutional questions. In its request for an

evidentiary hearing, the City identified the following categories of disputed facts which are material to the subject ordinance:

a.    The physical geography and demographics of where the Plaintiffs' solicitations occur.

b.    When the Plaintiffs' solicitations occur.

c.    The alternative avenues of communication available under the subject Ordinance.

d.    The manner in which Plaintiffs solicit at intersections.

e.    The nature of the medians subject to the City's regulations and the manner in which the Plaintiffs solicit in those medians.

f.    Whether Plaintiffs' solicitations are intended solely for commercial purposes or whether their solicitations include a non-commercial message likely to be understood by others (such as drawing attention to the plight of the homeless).

g.    Whether the Ordinance substantially burdens Plaintiffs' speech given the abundant alternative avenues provided and, if so, what specific aspects of the Ordinance burden what specific aspects of Plaintiffs' speech.

h.    Whether Plaintiffs intend to engage in "aggressive panhandling" and whether Daytona Beach's ban on such conduct has any effect on Plaintiffs' speech.

i.    The details and substance of the sworn statement and testimony of Dr. Steven Miles in support of a compelling state interest.

j.    The details and substance of the sworn statements and testimony of Bellanca, Harwick, Kosinski, Pierelli, Ross and Thomas concerning the effects that they have witnessed of panhandling

in Daytona Beach prior to and after the passage of the subject Ordinance.

k.  The substance and relevance of the sworn statement and testimony of John Clary, head of the intellectual property GIS division of Daytona Beach when the subject Ordinance was enacted, regarding the percentage (in terms of acreage) of Daytona Beach available for panhandling after application of the distance parameters of the subject Ordinance.

l.  The details, substance and relevance of each of the Plaintiff's sworn statements and the credibility of the Plaintiffs regarding their sworn statements and the complaint.

(Doc. 45 at 4-6).

As noted above, the trial Court entered its injunction order without conducting an evidentiary hearing and without the benefit of oral argument. (Doc. 72 at 6-7).

### C.    <u>Statement of the Standard of Review</u>

District court decisions concerning preliminary injunctions are reviewed for abuse of discretion. Findings of fact are reviewed for clear error and questions of law are reviewed *de novo*. *See*, <u>Eknes-Tucker v. Governor of Alabama</u>, 80 F.4th 1205, 1219 (11th Cir. 2023). "A district court's decision to issue a preliminary injunction without holding an evidentiary hearing is reviewed for abuse of discretion." <u>Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049</u>, 910 F.3d 1130, 1169 (11th Cir. 2018).

## SUMMARY OF THE ARGUMENT

Few preliminary injunctions warrant an interlocutory appeal; this one does. This litigation presents a case of first impression involving the constitutionality of a panhandling ordinance in the face of rapidly changing precedent. In particular, the City maintains that the Supreme Court's decision in City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61 (2022) significantly modified the standards for evaluating content-neutrality established in Reed v. Town of Gilbert, Ariz., 576 U.S. 155 (2015). Austin held that a law is not necessarily content-based simply because the enforcing authority must consider what was said in order to determine whether a law applies. In terms of panhandling / solicitation ordinances, Austin stands for, *inter alia* the proposition that creating categories of regulated and unregulated speech does not trigger strict scrutiny where enforcement does not turn on what is said.

In the wake of Reed, panhandling ordinances across the nation were declared to be unconstitutional. That result must be reconsidered in light of Austin. The trial Court erred below because it did not consider the significant change in the law that Austin wrought and because the Court failed to conduct an evidentiary hearing where the City identified specific contested facts that would allow its ordinance to survive even strict scrutiny.

8

# ARGUMENT

**I.    THE PRELIMINARY INJUNCTION ORDER FAILED TO CORRECTLY ANALYZE DAYTONA BEACH'S SOLICITATION ORDINANCE UNDER THE STANDARD SET IN <u>CITY OF AUSTIN, TEXAS V. REAGAN NAT'L ADVERT. OF AUSTIN, LLC</u>, 596 U.S. 61 (2022), WHICH ALLOWS FOR REGULATION OF SOLICITATIONS, PROVIDED ONLY THAT THEY DO NOT DISCRIMINATE ON THE BASIS OF TOPIC, SUBJECT MATTER OR VIEWPOINT.**

The trial Court abused its discretion in granting a preliminary injunction because it erred in determining that § 66-1 of the Daytona Beach Code discriminates on the basis of content. *See, generally*, <u>Curling v. Raffensperger</u>, 50 F.4th 1114, 1121 (11th Cir. 2022), *citing* <u>Gonzalez v. Governor of Georgia</u>, 978 F.3d 1266, 1270 (11th Cir. 2020) ("[A] court abuses its discretion in granting a preliminary injunction if, in determining whether success is likely, it incorrectly or unreasonably applies the law.").

Daytona Beach's regulations of panhandling and solicitations are not much different from laws which have been on the books for many years in communities across the country.[2] The City has enacted time, place and manner restrictions which

---

[2] *See, generally*, *Panhandling Laws*, The First Amendment Encyclopedia (2017) https://www.mtsu.edu/first-amendment/article/1215/panhandling-laws (last accessed 11/21/23). ("In recent years, an increasing number of U.S. cities have enacted ordinances restricting panhandling because of the influx of people living in public spaces. For the most part, cities are particularly concerned about the effects of panhandling on public safety, tourism and small businesses.").

govern where solicitation may take place. Crucially, this law is *not* dependent on the content or viewpoint of any solicitations. Solicitors remain free to say whatever they wish.  Solicitors can seek money or items of value for their own benefit or for any charity or cause they choose. *What* they say is not the issue under Daytona's Code. Rather it is *where* they say it, *when* they say it and - in the case of aggressive solicitations – *how* they say it.

In past years, ordinances regulating panhandling and other solicitations were typically treated as time, place and manner restrictions subject to intermediate scrutiny. Examples are legion. For example, in <u>Smith v. City of Fort Lauderdale, Fla.</u>, 177 F.3d 954, 956 (11th Cir. 1999) this Court upheld a ban on solicitations along the city's beaches. This Court determined that the ban was limited in terms of geography and subject to intermediate scrutiny.

In <u>Gresham v. Peterson</u>, 225 F.3d 899, 901–02 (7th Cir. 2000), the Seventh Circuit turned away a First Amendment and vagueness challenge to an ordinance which closely resembles Daytona Beach's law. In particular, the Indianapolis ordinance prohibited aggressive panhandling in terms almost identical to those employed by Daytona Beach.  Panhandling was also banned "on any day after sunset, or before sunrise." <u>Id</u>. at 901. Solicitations were also prohibited near bus stops, cafes, ATM machines and in parked vehicles. <u>Id</u>.  The Indianapolis ordinance

that the Seventh Circuit approved contains provisions very similar to Daytona's Ordinance.

Historically, laws such as those addressed in <u>Smith</u> and <u>Gresham</u> were not thought to be content-based because the subject matter of the conversation between the panhandler and the public was not at issue. The laws were constitutional because they were justified for reasons having nothing to do with the content or viewpoint of the speech or the identity of the speaker.

That view changed dramatically with the Supreme Court's decision in <u>Reed v. Town of Gilbert</u> which radically redefined what it means for a law to be content-based. In <u>Reed</u>, a case which had nothing to do with panhandling or solicitation, the Supreme Court evaluated a ban on temporary signs which allowed for a host of categorical exceptions based on the message displayed. Justice Thomas, speaking for a particularly fractured plurality, in a paragraph which is the focal point of the central issue in the instant case, found that the need to evaluate the content of individual signs meant that the ordinance was content-based even if the goal was not to censor any particular message:

> Our precedents have also recognized a separate and additional category of laws that, **though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech**,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," <u>Ward v. Rock</u>

11

Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

Reed, 576 U.S. at 163–64. (emphasis added).

While not directly addressing the subject of panhandling, the foregoing paragraph in Reed nonetheless had an immediate, dramatic, and pervasive effect on the lower courts' treatment of solicitation ordinances. As one conspicuous example, the Supreme Court directly vacated and remanded the case of Thayer v. City of Worcester, 755 F.3d 60, 67–68 (1st Cir. 2014), which had been pending when Reed was decided. Thayer had upheld a traditionally unremarkable law which prohibited solicitations in medians and aggressive panhandling. The City of Worchester ordinance did not survive Reed on remand. *See*, Thayer v. City of Worcester, 2017 WL 1190366 (D. Mass. 2017).

Even more striking were the bookend opinions in Norton v. City of Springfield, Ill., 768 F.3d 713 (7th Cir. 2014), decided before Reed, and the same case on remand, Norton v. City of Springfield, Ill., 806 F.3d 411 (7th Cir. 2015). In the first Norton decision, the Seventh Circuit easily upheld a historically routine, conventional solicitation law against a First Amendment challenge. Following Reed, the Seventh Circuit completely reevaluated its position and reached exactly the opposite decision. The Court also noted the impact that Reed had on what was

12

previously well-established law:

> I join the opinion of the court in full, but write separately to underscore the significance of the Supreme Court's recent decision in <u>Reed v. Town of Gilbert</u>, which held that a speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter. \_ U.S. \_, 135 S.Ct. 2218, 2230, 192 L.Ed.2d 236 (2015). ... **Few regulations will survive this rigorous standard.**

<u>Norton</u>, 806 F.3d 411, 413 (7th Cir. 2015) (J. Manion, concurring) <u>(emphasis added)</u>.[3]

 <u>Thayer</u> and <u>Norton</u> were followed by a tsunami of decisions which overturned historically acceptable solicitation laws based on <u>Reed</u>. *See, e.g.*, <u>Messina v. City of Fort Lauderdale, Fla.</u>, 546 F.Supp. 3d 1227, 1240 (S.D. Fla. 2021) ("[P]anhandling laws, in the wake of <u>Reed</u>, have been enjoined by federal courts across the country…").

 As will be discussed in more detail below, the trial Court applied <u>Reed</u> in its unadulterated form without considering the notable change in the law effected by the Supreme Court's recent decision in <u>Austin</u>. <u>Austin</u> considered whether a law prohibiting off-site billboards, but allowing on-site advertising, was content-based.

---

[3] The Appellant wonders, rhetorically at this juncture, whether that was the result that <u>Reed</u> anticipated or even desired? The concurring opinion in <u>Reed</u> which Justices Kagan, Ginsburg and Breyer join suggests otherwise. "So on the majority's view, courts would have to determine that a town has a compelling interest in informing passersby where George Washington slept." <u>Reed</u>, at 181.

The lower Court struck down the law as an easy and self-evident application of <u>Reed</u>:

> [I]f "[a] reader must ask: who is the speaker and what is the speaker saying" to apply a regulation, then the regulation is automatically content based.

<u>City of Austin</u>, 596 U.S. at 69 *citing* <u>Reagan Nat'l Advert. of Austin, Inc. v. City of Austin</u>, 972 F.3d 696, 706 (5th Cir. 2020).

The Supreme Court reversed, finding that a law was *not* necessarily content-based simply because one had to read the message to determine whether the law applies:

> Underlying these cases and others is a rejection of the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern. Rather, it is regulations that discriminate based on "the topic discussed or the idea or message expressed" that are content based. <u>Reed</u>, 576 U.S. at 171, 135 S.Ct. 2218. The sign code provisions challenged here do not discriminate on those bases.

<u>Id</u>. at 73–74.

While not overturning the entirety of <u>Reed</u>, there can be no question that <u>Reed's</u> content-neutrality inquiry has been modified. The Court describes this as a rejection of a simple "read-the-sign rule" in favor of a review which determines whether categorical distinctions treat different speakers differently. <u>Id</u>. at 75.

In <u>Austin</u>, the Supreme Court felt it necessary to directly address the constitutionality of laws regulating solicitation:

> Most relevant here, the First Amendment allows for regulations of

14

solicitation - that is, speech "requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." Black's Law Dictionary 1677 (11th ed. 2019). To identify whether speech entails solicitation, one must read or hear it first. Even so, the Court has reasoned that ***restrictions on solicitation are not content based*** and do not inherently present "the potential for becoming a means of suppressing a particular point of view," so long as they do not discriminate based on topic, subject matter, or viewpoint. <u>Heffron v. International Soc. for Krishna Consciousness, Inc.</u>, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

<u>Id</u>. at 72 (emphasis added); *See, also*, <u>Hines v. Pardue</u>, __ F.Supp.3d __, 2023 WL 5254673 at *19 (S.D. Tex. Aug. 15, 2023) ("[S]olicitation restrictions represent content-neutral regulations, 'so long as they do not discriminate based on topic, subject matter, or viewpoint.'" (*quoting* <u>City of Austin</u>)).

Clearly, <u>Austin's</u> consequential statement that "restrictions on solicitation are not content based" was motivated by the concurring opinions in <u>Reed</u> which warned of unintended consequences of that decision:

> [O]n the majority's view, courts would have to determine that a town has a compelling interest in informing passersby where George Washington slept.…
> …
> … [C]ourts will strike down those democratically enacted local laws even though no one - certainly not the majority - has ever explained why the vindication of First Amendment values requires that result.

<u>Reed</u>, 576 U.S. at 181, 185 (J. Kagan, concurring).[4]

---

[4] Justice Breyer echoed those same thoughts in his concurring decision in <u>Austin</u>:

Justice Breyer's prescient concurrence in <u>Reed</u> included a list of laws which should not be considered to be content-based as a category, such as securities regulations and warnings on prescription labels. <u>Id</u>. at 177 (J. Breyer, concurring). In <u>Austin</u>, Justice Breyer expanded on that initial list to specifically include "panhandling" and "solicitation on behalf of charities". <u>Austin</u>, 596 U.S. at 79 (J. Breyer, concurring).

<u>Austin</u> is so recently decided that the Eleventh Circuit has not yet spoken definitively on the subject[5] and no Florida Court has yet issued a ruling directly on point. Daytona Beach has also found no post-<u>Austin</u> case which has specifically addressed the constitutionality of panhandling ordinances. However, the contours of

------

> If <u>Reed</u> is taken as setting forth a formal rule that courts must strictly scrutinize regulations simply because they refer to particular content, we have good reason to fear the consequences of that decision. One possibility is that courts will strike down "entirely reasonable" regulations that reflect the will of the people.

<u>Austin</u>, 596 U.S. at 79–80 (J. Breyer, concurring).

[5] To date, only one Eleventh Circuit case has cited to <u>Austin</u> <u>which was</u> <u>LaCroix v.</u> <u>Town of Fort Myers Beach, Fla.</u>, 38 F.4th 941, 947 (11th Cir. 2022). <u>LaCroix</u> determined that a ban on all portable signs was content-neutral under <u>Austin</u> because the ban applied to all portable signs regardless of what message was displayed. The analysis in <u>LaCroix</u> has some value for this case. Section 66-1 must be deemed content-neutral because it applies to all instances of solicitation for the immediate donation of money or consideration. It must be upheld under intermediate scrutiny because it does *not* impose a complete ban (as was the case in <u>LaCroix</u>) but allows unrestrained solicitations almost everywhere in the City during any daylight hours.

16

Austin are becoming clear as Circuit Courts elsewhere begin to apply Austin to cases with subject matter other than signage which mentions the critical effect of Austin to Reed regarding solicitations.

Mazo v. New Jersey Sec'y of State, 54 F.4th 124 (3d Cir. 2022), *cert. denied sub nom*. Mazo v. Way, No. 22-1033, 2023 WL 6377826 (U.S. Oct. 2, 2023) is one case, not involving signage, that recognized the impact of Austin on Reed. In Mazo, the Third Circuit upheld the decision of the New Jersey Secretary of State to deny political candidates' request to include their campaign slogans on primary ballots. In addressing the question of content-neutrality, the Court began by explaining the specific changes in the law wrought by Austin:

> Under City of Austin, then, a law is "agnostic as to content," if it "requires an examination of speech only in service of drawing neutral" lines. Id. at 1471. One category of such neutral line-drawing tracks ordinary time, place, or manner regulations, such as the on-/off-premises distinction at issue in City of Austin, which related only to the location of speech. *See* id. at 1472-73. **A second category of neutral line-drawing distinguishes between speech based on its function or purpose without indirectly regulating subject matter, such as whether speech constitutes "solicitation."** Id. at 1473.

Id. at 149 (emphasis added).  Significantly for the instant case, Mazo specifically mentions the impact of Austin on Reed with regard to solicitation.

While the New Jersey restriction applied only to slogans and not to other content (such as the candidate's name or party affiliation), the Court noted that *all*

slogans were subject to the law so that it was proper to treat the regulation as content-neutral:

> Unlike the sign code in <u>Reed</u>, the consent requirement applies to all slogans, regardless of message, and does not "single out any topic or subject matter for differential treatment." <u>Id</u>. at 1472. Appellants argue that the consent requirement regulates slogans based "entirely on the communicative content of [slogans,]" but this is not so. … Rather, the communicative content of the slogan - i.e., whether the slogan names an individual or a New Jersey incorporated association - only matters to determine whether the consent requirement applies at all. Once a regulator has read a slogan to determine whether the consent requirement applies, the communicative content of the slogan ceases to be relevant. Accordingly, the consent requirement is content neutral.

<u>Id</u>. at 149.

In <u>Porter v. Martinez</u>, 68 F.4th 429 (9th Cir. 2023), the Ninth Circuit turned away a motorist's challenge to a state law which prohibited honking except for purposes of traffic safety. The Court found that the law was content-neutral in the context of honking as a show of political support:

> As the Court emphasized in <u>City of Austin</u>, it has treated as content neutral regulations of solicitation - "that is, speech 'requesting or seeking to obtain something' or '[a]n attempt or effort to gain business,'" <u>Id</u>. (alteration in original) (quoting *Solicitation*, Black's Law Dictionary (11th ed. 2019)) - even though enforcement requires an examination of the speaker's message.

<u>Id</u>. at 442.

These cases show a widespread recognition that solicitation ordinances will not be deemed content-based under <u>Austin</u> unless they target particular speakers or

18

messages. In other words, distinctions based on categories defined by speech are not automatically content-based unless they also discriminate against certain speakers because of what is said. The significance of a finding of content-neutrality for the instant case is that the law will be subject to intermediate scrutiny rather than strict scrutiny. *See*, Austin, 596 U.S. at 76.

The trial Court appears to have understood Appellant's argument that Austin had significantly modified Reed and that Austin specifically carved out solicitation laws as a category which did not automatically draw strict scrutiny. However, the lower Court refused to apply those lessons to Daytona Beach's solicitation law:

> Much of Defendant's argument centers around its proposition that Austin overturned the effect of Reed on "solicitation laws" like the Ordinance at issue in this case. This Court disagrees. At issue in Reed was a sign code that subjected designated categories of signs, including ideological, political, and temporary, to different restrictions. Reed, 576 U.S. at 159–161. The Reed Court held the sign code to be content based because it "single[d] out specific subject matter for differential treatment, even if it [did] not target viewpoints within that subject matter." Id. at 169. Later, in Austin, the Court considered whether a law prohibiting off-site billboards but allowing on-site advertising was content based. Austin, 142 S. Ct. at 1469–70. There, the Court held the law was content neutral because it did "not single out any topic or subject matter for differential treatment" and further reasoned that the law's "on-/off-premises distinction [was] . . . similar to ordinary time, place, or manner restrictions," as "[a] given sign [was] treated differently based solely on whether it [was] located on the same premises as the thing being discussed or not." Id. at 1472–73. Importantly, the Austin Court specifically stated, "we do not 'nullif[y]' Reed's protections . . . [n]or do we cast doubt on any of our precedents recognizing examples of topic or subject-matter discrimination as

content based." Id. at 1475. The Ordinance in this case is more analogous to the sign code at issue in Reed, in that a specific topic - requests for charity - is subject to different treatment than other messages.

(Doc. 72 at 10-11).

The trial Court treats Austin as if it can be distinguished based solely on the facts of the two cases. (Id.). But Austin represents a true point of departure; it modified the law established by Reed and did not merely distinguish the case on its facts. First Amendment doctrine is *not* the same after Austin.

## A. DAYTONA BEACH'S SOLICITATION ORDINANCE DOES NOT DISCRIMINATE ON THE BASIS OF TOPIC, SUBJECT MATTER OR VIEWPOINT.

In addition to missing the import of Austin, the District Court fundamentally misconstrued the purpose and effect of Daytona Beach's solicitation ordinance:

In this case, the Challenged Provisions are content based because they apply exclusively to solicitations or requests for charitable donations. Stated differently, under the Challenged Provisions, individuals are only prohibited from asking for charitable donations while permitted to solicit regarding any other topic.

(Doc. 72 at 9).

It is not clear how the Court could have possibly reached such a conclusion given the plain language of the Ordinance which comprehensively defines solicitation so that it reaches *every* conceivable instance where an immediate

donation is made in response to a request:

> *Panhandle* means to beg or make any demand or request made in person for an immediate donation of money or some other article of value from another person for the use of one's self or others, including but not limited to for a charitable or sponsor purpose or that will benefit a charitable organization or sponsor. As used in this article, the word "solicit" and its forms are included in this definition.… Begging is included in this definition of panhandling. Soliciting is including in this definition of panhandling.

§ 66-1(b)(3) Definitions *Panhandle* (Doc. 20-2 at 9). That all-inclusive definition was specifically written so that there would be no exceptions. All requests for the immediate donation of money are included, regardless of content, viewpoint or the identity of the speaker.[6] In the words of <u>Austin</u>, the Ordinance is completely "agnostic as to content". <u>Austin</u>, 596 U.S. at 69.

According to § 66-1, a regulated solicitation certainly could be for charitable purposes. However, the solicitation could also be for political or religious purposes or to support some social cause. Daytona Beach briefed this point repeatedly, comprehensively and as clearly as possible:

> A politician or clergyman who solicits a direct donation or contribution will be prosecuted under the Ordinance to the same extent as a

---

[6] The fact that the Ordinance regulates only where there is an exchange of money or other thing of value does not transform the Ordinance into a content-based law. *See*, <u>StreetMediaGroup, LLC v. Stockinger</u>, 79 F.4th 1243, 1250–51 (10th Cir. Aug. 22, 2023) (Sign law which required billboard owners to obtain a permit for displaying paid messages but not for messages for which payment was not received was not content-based).

> panhandler – not because of their political or religious speech, but because they solicited incident to that speech.

(Doc. 44 at 15).

> If a politician or an evangelist engages in solicitation, that individual will be subject to the Ordinance to the same extent as someone seeking alms. The Ordinance regulates the act of solicitation; not the content of the communication.

(Doc. 44 at 19).

The trial Court went astray during an ill-advised attempt to construe statutory language which is clear and unambiguous on its face.[7] In fact, it is possible to identify the precise error in the Court's analysis. The trial Court apparently understood that Section 66-1 defined the term "panhandle" to include a number of concepts within it scope, including both "solicitation" and "begging". (Doc. 72 at 10: "A plain reading of this definition demonstrates that, under the Ordinance, "solicit" is treated as a subset of panhandling…").[8] The Court then erroneously

---

[7] There is no call for statutory construction where there is no ambiguity. *See*, *e.g.*, United States v. Dawson, 64 F.4th 1227, 1236 (11th Cir. 2023) ("If the language of the statute is clear and unambiguous, we will go no further and will employ that plain meaning.").

[8] There is nothing ambiguous about the definition of "panhandling" nor is there anything unusual about including the terms "begging" and "soliciting" within the broader statutory definition. Indeed, the Eleventh Circuit has long since observed that "soliciting," "begging," and "panhandling" are interchangeable terms". *See*, Smith v. City of Fort Lauderdale, Fla., 177 F.3d 954, 955 (11th Cir. 1999).

22

concluded that the subject ordinance does not apply "to all types of solicitations as Defendant argues." (Id.).

The City regulates commercial solicitations through other provisions of its Code.[9] Section 66-1 addresses an entirely different problem which falls outside the scope of the City's commercial restrictions. Within the defined category of "panhandling", § 66-1 does in fact apply to every solicitation for the immediate donation of money. According to Austin, that fact means that the Ordinance is not content-based.

The Court's error in this case can be compared to the District Court's decision in Nat'l Fed'n of the Blind of Texas Inc. v. City of Arlington, Texas, No. 3:21-CV-2028-B, 2022 WL 4125094 (N.D. Tex. Sept. 9, 2022) which avoided the same illogical error. In Nat'l Fed'n of the Blind, a charitable organization challenged an ordinance which prohibited the use of unattended donation bins. The plaintiff claimed that the law targeted charitable donations and was therefore content-based. The District Court rejected that argument, finding that the law was content-neutral

---

[9] The City has a comprehensive system for regulating street vendors and others engaged in commercial solicitations within Daytona Beach. See, § 66-32 (Selling or offering to sell from vehicles on public streets or rights-of-way); § 82-4 (Display, promotion, or sales of merchandise, food, and beverages); § 94-8. ("No person shall stand or otherwise occupy a roadway or right-of-way within the city for the purpose of soliciting a ride, employment, or business from the occupant of any vehicle.").

under Austin:

> Applying the Supreme Court's most recent guidance on this subject, Reagan, the Court finds that Arlington's Ordinance is facially content neutral because it does not discriminate based on the solicitation's topic, subject matter, or viewpoint, but treats bin-based signage soliciting donations to be deposited in that location differently from communications soliciting donations for deposit elsewhere or pickup.

Id. at *7.

The similarities to § 66-1 are apparent. The ordinance in Nat'l Fed'n of the Blind did not apply to every donation bin but only to those which were unattended. Similarly, Daytona Beach's Ordinance does not apply to every possible type of solicitation. Commercial solicitations and requests for donations at a later time are excluded from the scope of the law. However, just as the City of Arlington chose to regulate any *unattended* bin, Daytona Beach regulates every solicitation which involves a request for an immediate donation. After Austin, neither law can be considered to be content-based.

The District Court compounded its initial error by making a further erroneous conclusion which finds no support in the actual text of the Ordinance:

> [W]hen reading the Ordinance as a whole, it is clear it applies only to charitable solicitations.

(Doc. 72 at 10). Where does that idea come from? The Ordinance as written speaks of "soliciting"; not "charitable soliciting." The injunction Order does not identify

24

any other part of § 66-1 which must be read *in pari materia*. There is no suggestion that one part of the law conflicts with another or that a definition is incomplete so that reference must be made to some other part of the Ordinance. The Order does not find that the term "panhandle" is vague or cannot be understood to also include the term "solicit" – which it does explicitly. *See*, § 66-1(b)(3) ("Soliciting is included in this definition of panhandling."). In short, the term "panhandle" is fully defined, internally consistent and does not have to be read in conjunction with "the Ordinance as a whole" or any portion of the Ordinance other than itself.

The District Court erroneously ruled that "[t]he Ordinance does not provide definitions for begging and  soliciting." (Doc. 72 at 1, n. 1). In actuality, § 66-1 defines "panhandling" with concise language and specifically states that begging" and "soliciting" are included within that defined term. The trial Court consulted Black's Law Dictionary for a common definition of the term "solicitation" and adopted that verbiage instead of the definition actually utilized by the Ordinance. (Id.). That effort was not only unnecessary, but contravenes one of the cardinal rules of statutory construction:

> When "a statute includes an explicit definition" of a term, "we must follow that definition, even if it varies from a term's ordinary meaning."

Van Buren v. United States, 593 U.S. __, 141 S. Ct. 1648, 1657 (2021), *quoting*

Tanzin v. Tanvir, 592 U. S. ___, __, 141 S.Ct. 486, 490 (2020); *See, also*, Kirtz v.

Trans Union LLC, 46 F.4th 159, 171 (3d Cir. 2022), *quoting* Sturgeon v. Frost, __ U.S. _, 139 S. Ct. 1066, 1086 (2019) ("[T]he Supreme Court has repeatedly held that where a statute contains an 'express definition,' that definition is 'virtually conclusive' and must be applied for all purposes '[s]ave for some exceptional reason.'").

In short, the trial Court construed an ordinance which was not in any need of interpretation to reach a result which is utterly unsupportable given the plain text of the law. It is beyond peradventure that the law is content neutral on its face as Daytona Beach intended it to be. To reach any other conclusion requires an erroneous and extraordinary effort of gigantic proportion.

Under Austin, a solicitation law which does not discriminate based on content or the identity of the speaker is content-neutral on its face is subject to intermediate scrutiny, not strict scrutiny. *See*, StreetMediaGroup, LLC v. Stockinger, 79 F.4th 1243, 1252 (10th Cir. 2023) ("Because the Act and rules are content neutral under Supreme Court precedent, we review under the intermediate scrutiny standard of review."); *Compare*, Smith, *supra* (Upholding a ban on solicitations on the Fort Lauderdale's beaches under intermediate scrutiny).

Section 66-1 regulates *all* attempts to solicit an immediate donation of money (or other item of value) without regard to content or viewpoint. Accordingly, the

26

Ordinance should have been construed under the Austin standard, which provides for intermediate scrutiny. *See*, Austin, 596 U.S. at 72 ("[T]he First Amendment allows for regulations of solicitation… To identify whether speech entails solicitation, one must read or hear it first. Even so, the Court has reasoned that restrictions on solicitation are not content based.").

### B. DAYTONA BEACH'S SOLICITATION ORDINANCE SURVIVES REVIEW UNDER INTERMEDIATE SCRUTINY.

In its preliminary injunction Order, the trial Court did not address intermediate scrutiny at all, which was error. Time, place and manner restrictions, such as § 66-1, are typically reviewed under the three-part test announced in Ward v. Rock Against Racism, 491 U.S. 781 (1989):[10]

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (citations omitted).

---

[10] There are numerous tests for intermediate scrutiny in cases such as Ward, U. S. v. O'Brien, 391 U.S. 367 (1968), and Renton. However, as a practical matter, these various tests all lead to the same result. *See, e.g.*, Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1291–92 (11th Cir. 2021) (Considering time, place and manner restrictions and regulations of expressive speech before concluding that "[t]hese standards substantially overlap and yield the same result in this case."); Club Madonna Inc. v. City of Miami Beach, 42 F.4th 1231, 1244 (11th Cir. 2022) For purposes of this litigation, the Ward time, place and manner standards are the most appropriate.

Id. at 791.

Daytona Beach's panhandling Ordinance is intentionally written so that it regulates every kind of "solicitation" involving an immediate request for money without regard to the speaker or the particular content of his speech. Thus, an individual soliciting for political or religious purposes, or on behalf of a social cause, or for her own benefit, is treated exactly the same. If that speaker asks the solicited party to give her something of value, she is subject to § 66-1 regardless of what the money or consideration is to be used for or the individual who will benefit from the payment.[11] If the speaker merely wishes to draw attention to the plight of the homeless or if the speaker requests a donation of money at some future time or place he can do so without any regulation at all.

In this regard, § 66-1 comports precisely with the Supreme Court's ruling in Austin. Daytona Beach comprehensively and carefully defined solicitors in § 66-1 as category of speakers subject to regulation.  In doing so, Daytona Beach intentionally reflected that Austin specifically held that "the First Amendment

---

[11] As noted above, the trial Court improperly construed the word "donation" to mean "charitable donation". However, the word is not so limited in the Ordinance. Rather, § 66-1 plainly intends to reach every instance in which money or some item of value is requested and immediately received. While charitable donations are included within the scope of the Ordinance, so is every other transaction where some item of value is given upon request.

allows for regulation of solicitation". <u>Austin</u>, 596 U.S. at 72. The category of "solicitation" is obviously defined in terms of speech, and "[t]o identify whether speech entails solicitation, one must read or hear it first". However, <u>Austin</u> tells us that such ordinances are not content-based so long as they do not turn on what is said or who is doing the speaking. <u>Id</u>.[12] Individuals who engage in solicitation, as defined in § 66-1, are treated the same regardless of "topic, subject matter, or viewpoint". <u>Id</u>.

Having erred from the start in concluding that § 66-1 was content-based, the trial Court never considered any aspects of intermediate scrutiny including the substantiality of Daytona Beach's governmental interests. Instead, the Court applied strict scrutiny, mandating a compelling government interest (usually the death knell of any ordinance, however previously routine or commonplace, after <u>Reed</u>). (Doc. 72 at 11-13).[13]

---

[12] This is the point of departure between <u>Austin</u> and <u>Reed</u>. Under the earlier precedent, a category defined in terms of speech would be considered content-based even if the category did not distinguish between individual speakers or turn on the content of what was said. Thus, one could not regulate solicitors as a class under <u>Reed</u>, but such regulations are specifically permissible under <u>Austin</u>.

[13] In <u>Reed,</u> the concurring opinion of Justices Kagan, Ginsburg and Breyer agrees with that assessment, stating that it is the "rare case[] in which a speech restriction withstands strict scrutiny (citations omitted)" <u>Reed</u>, at 180.

The trial Court did correctly list the interests asserted by <u>Daytona Beach</u> in support of § 66-1 which comport with intermediate scrutiny, including prevention of disease, pedestrian safety, aesthetics, historical context, and concerns with traffic flow. (Doc. 72 at 12). The Ordinance contains numerous predicate clauses which set forth interests which have been deemed significant and important by cases applying intermediate scrutiny. The legislative record, consisting of four hearings, totaling over 10 hours, with 24 witnesses, is replete with supportive evidence of those significant government interests which satisfy intermediate review. (Doc. 20). Daytona Beach provided the Court with sworn statements regarding the effects of panhandling on the City, all of which reflect substantial (as well as two compelling) government interests in regulating solicitations through the means adopted in § 66-1. (Doc. 44-1; Doc. 44-3; Doc. 44-4; Doc. 44-6; Doc. 44-7; Doc. 73-1).

There is no question that the governmental interests set forth in the predicate clauses of Daytona Beach's solicitation Ordinance are substantial:

> It is well settled that "a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." <u>Heffron v. International Society For Krishna Consciousness</u>, 452 U.S. 640, 650, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981). *See also* <u>Messer v. City of Douglasville, Ga.</u>, 975 F.2d 1505, 1510 (11th Cir. 1992) (holding that "both traffic safety and aesthetics are substantial governmental goals"). As the Supreme Court stated, "[M]unicipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for the movement of people and property, the primary purpose to which the streets are

dedicated." <u>Schneider v. State of New Jersey</u>, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

<u>Int'l Caucus of Lab. Committees v. City of Montgomery</u>, 111 F.3d 1548, 1551 (11th Cir. 1997). The existence of even one substantial interest is sufficient to support a regulation. *See*, <u>Fla. Bar v. Went For It, Inc.</u>, 515 U.S. 618, 624, n. 1 (1995). For the most part, the Court did not question the substantiality of Daytona Beach's governmental interests in regulating panhandling pursuant to intermediate review.

Instead, the Court focused on determining whether the least restrictive means of regulation were adopted. (Doc. 72 at 12). "Assuming these constitute compelling government interests, Defendant has made no argument as to how the Challenged Provisions are narrowly tailored to further those interests."). <u>Id</u>. The dispute below was primarily decided on the issue of the trial Court's erroneous, overly stringent conclusion that strict scrutiny of the Ordinance was mandated while generally ignoring the possibility of intermediate review.

While the burden is on the government to show that it has adopted a narrowly tailored law, it is not the business of the Courts to second-guess reasonable legislative decisions:

> To survive First Amendment scrutiny, a commercial speech prohibition must employ "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but ... a means narrowly tailored

31

to achieve the desired objective. Within those bounds we leave it to
governmental decisionmakers to judge what manner of regulation may
best be employed." <u>Fox</u>, 492 U.S. at 480, 109 S.Ct. at 3035 (quotations
and citation omitted).

<u>FF Cosmetics FL, Inc. v. City of Miami Beach</u>, 866 F.3d 1290, 1299 (11th Cir.

2017); *See, also,* <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 662 (1994),

*quoting* <u>Ward</u>, *supra* ("To satisfy this standard, a regulation need not be the least

speech-restrictive means of advancing the Government's interests. 'Rather, the

requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a

substantial government interest that would be achieved less effectively absent the

regulation.'").

In <u>Board of Trustees of State Univ. of New York v. Fox</u>, 492 U.S. 469 (1989)

the Supreme Court emphasized that narrow tailoring for purposes of intermediate

scrutiny is to be contrasted with the least restrictive means standard employed in

cases involving strict scrutiny. There must be some "give" in the joints when it

comes to determining whether a law could be more narrowly tailored:

> We have refrained from imposing a least-restrictive-means requirement
> - even where core political speech is at issue - in assessing the validity
> of so-called time, place, and manner restrictions. We uphold such
> restrictions so long as they are "narrowly tailored" to serve a significant
> governmental interest... a standard that we have not interpreted to
> require elimination of all less restrictive alternatives... [W]e have not
> insisted that there be no conceivable alternative, but only that the
> regulation not "burden substantially more speech than is necessary to
> further the government's legitimate interests," <u>Ward v. Rock Against</u>

Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). And we have been loath to second-guess the Government's judgment to that effect….

None of our cases invalidating the regulation of commercial speech involved a provision that went only marginally beyond what would adequately have served the governmental interest. To the contrary, almost all of the restrictions disallowed under Central Hudson's fourth prong have been substantially excessive, disregarding "far less restrictive and more precise means." Shapero v. Kentucky Bar Assn., 486 U.S., at 476, 108 S.Ct., at 1923…. Rather, we said that it was "up to the legislature to decide" that point, so long as its judgment was reasonable.  (Some citations omitted).

Id. at 477-79.

The trial Court clearly applied strict scrutiny, although it makes use of the generic term "narrow tailoring" rather than the "least restrictive means" test reserved for content-based laws. (Doc. 72 at 12-13).

The trial Court suggests that the City did not properly address narrow tailoring in its filings, saying that "it is not the Court's obligation to speculate or make arguments on behalf of Defendant". (Doc. 72 at 12). However, that is not a fair characterization of the City's briefing on the subject: narrow tailoring was specifically addressed in Daytona's Response. (Doc. 44 at 3, 8, 16-17).

In its legislative record enacting the subject solicitation Ordinance, the City introduced substantial evidence regarding its efforts to draft a law which was narrowly tailored to advance its interests without unnecessarily burdening Plaintiffs'

33

speech rights. (Doc. 20; 44-2; Doc. 73-1 at 6-7).

Some of that evidence is apparent on the face of the Ordinance. The City's Ordinance does not ban panhandling. In fact, the Ordinance barely regulates it at all. Panhandling is permitted without any restrictions in 97.5% of the City during all daylight hours. (Doc. 44-2 at 28). The areas where panhandling is regulated are closely tied to high-traffic areas in terms of vehicular or pedestrian movement. (Doc. 73-1 at 1, ¶5, 2, ¶¶9-10, 3, ¶12, 4, ¶¶17-18, 5-6, ¶¶27-29). Even there, a panhandler can panhandle if he adheres to the distance parameters of the Ordinance. Even there, a panhandler or anyone can bring attention to the plight of the homeless and encourage charitable giving so long as there is no immediate donation of money or consideration.

Narrow tailoring is also demonstrated in the legislative record which is before this Court in terms of the evidence considered by the City Commission. The Commission closely studied a very similar ordinance enacted in St. Augustine along with the entire evidentiary record developed in that city's public hearings. (Doc. 20-5 at 172-173; 20-10; 20-11; 20-12; *See, also*, Doc. 20-5 at 83-84, 93-97). St. Augustine is a comparable city, located relatively nearby, which faced many of the same problems with unregulated solicitations which Daytona Beach faced. (Id.). It was entirely reasonable for the City of Daytona Beach to look at the experiences of

34

other cities and the legislative solutions tried elsewhere to address a common problem. Indeed, case law shows that consideration of other ordinances is a bellwether for determining whether a local government has considered the impact of its regulations on speech. *See, e.g.*, Billups v. City of Charleston, S.C., 961 F.3d 673, 688 (4th Cir. 2020) (Ordinance governing tour guides was not narrowly tailored where city ignored voluntary tour guide certification program used by other local governments around the country); FF Cosmetics, 866 F.3d at 1300–01.

The trial Court examined several specific provisions of § 66-1 regulating solicitations at bus stops and ATMs, panhandling at night, the "traffic provisions" and the "conduct-related provisions"[14] and claimed that the City had introduced no evidence on these points.[15] (Doc. 72 at 12-13). The Court's fact-finding in this regard

---

[14] Plaintiffs did not allege that they engage in aggressive solicitation as that term is defined in the Ordinance or that any they have been threatened with arrest or citation for aggressive panhandling. (Doc. 35 at 10-13).

[15] While this portion of the Order follows immediately after the brief discussion of narrow tailoring, the actual language of the Order is couched in terms of over- and under-inclusiveness. These doctrines are not typically part of intermediate scrutiny and are not the equivalent of independent constitutional violations. Rather, they are merely tools to determine whether a law is content-based. *See, generally*, Williams-Yulee v. Fla. Bar, 575 U.S. 433, 449 (2015) ("Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation'" (citation omitted)). Daytona's solicitation ordinance is not riddled with exceptions like those usually found when a law is underinclusive. *Compare*, Reed, *supra*.

was clearly erroneous in multiple respects.

First, the record before the Court shows conclusively that Appellant introduced evidence in support of its Ordinance on all of these points. (Doc. 73-1 at 1, ¶5, 2, ¶¶9-10, 3, ¶14, 4, ¶17, 5-6, ¶¶27-29 [basis for location-based restrictions; public defecation and urination as unique problem]; Doc. 44-4 [aggressive panhandling; defecation and urination at business entrance]; Doc. 44-5 [unique public health risks and ties to panhandling]; Doc. 44-6 at 2, ¶¶7-15, 3, ¶¶18-19 [aggressive panhandling; solicitations after dark]). The City Commission heard and saw firsthand testimony and evidence in support of the Ordinance from police officers, the fire department chief and personnel, public work employees, business owners and employees about the adverse effects of panhandling.

Second, the Court improperly discounted the legislative judgment that the problems posed by unregulated panhandling were best met with the targeted, location-specific restrictions implemented by § 66-1. *See*, Fox, *supra*; Turner Broadcasting, *supra*; FF Cosmetics, *supra*; *Compare*, Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1296 (11th Cir. 2021) ("Of course, the mere availability of less restrictive alternatives will not cause a regulation to fail narrow tailoring scrutiny, and we may not 'replace the City as the manager of its parks.'").

The District Court's failure to acknowledge the record evidence again shows why the Court would have benefited from an evidentiary presentation or even an oral argument on the legal issues. *Cf.*, <u>Ranch House, Inc. v. Amerson</u>, 238 F.3d 1273, 1284 (11th Cir. 2001) ("We therefore remand this case to afford the Defendants… an opportunity to develop a foundation for their claim that the statute's purpose was to combat secondary effects").

The Ordinance also provided alternative avenues of communication. Given the variety of regulatory tools available to it, Daytona Beach elected to regulate primarily by identifying the locations where panhandling had historically led to problems and permit panhandling unhindered elsewhere. As a result, those few locations where panhandling is regulated are primarily limited to busy intersections where solicitations would present a danger to both drivers, pedestrians including panhandlers. It is important to note that panhandlers can still solicit if they comply with the distance regulations contained in the Ordinance, and in much of the City without any regulation.

Other locations where panhandlers are regulated under § 66-1 are areas where pedestrians are concentrated at entranceways to businesses and public buildings. These are places where dangers incident to congestion lurk or other problematic areas where individuals are captive audiences (such as at ATMs). Each of these

relatively few locations is closely tied to the City's substantial interests in protecting traffic flow, pedestrian safety and promoting aesthetic values and, thus, satisfy intermediate review. Where that sort of linkage is demonstrated on the record, Courts must defer to the reasoned decisions of local legislators. *See, e.g.*, Jim Gall Auctioneers, Inc. v. City of Coral Gables, 210 F.3d 1331, 1333 (11th Cir. 2000) ("We see no reason to revisit the district court's finding that the City has a substantial interest in maintaining the aesthetics and tranquility of its residential neighborhoods, as well as in regulating traffic flow.").

The City ensured that sufficient alternative avenues of communication were available to solicitors, amounting to more than 97.5% of the City's geographic area. (Doc. 44-2 at 28). *Compare*, City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986) (Upholding adult entertainment zoning where only five percent of the city was available for those uses). The burden on speech here is slight. Plaintiffs can either move a few feet to a lawful location to solicit money or they can engage in advocacy anywhere so long as they do not seek an immediate donation of money.

Section 66-1 of the Daytona Code satisfies intermediate scrutiny in all respects.

**C.     EVEN IF DAYTONA BEACH'S SOLICITATION ORDINANCE IS CONTENT-BASED, IT SURVIVES STRICT SCRUTINY GIVEN THE COMPELLING GOVERNMENT INTERESTS ASSERTED AND THE NARROWNESS OF THE**

38

**REGULATION.**

To the extent that strict scrutiny applies, Daytona Beach's solicitation Ordinance has predicate clauses that assert compelling government interests and evidence in support of these interests is contained in the legislative record before this Court. Regulations can and do survive strict scrutiny where the interest is compelling and the law is carefully crafted:

> We have emphasized that "it is the rare case" in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest. Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion). But those cases do arise. *See* ibid.; Holder v. Humanitarian Law Project, 561 U.S. 1, 25–39, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010); McConnell, 540 U.S., at 314, 124 S.Ct. 619 (opinion of KENNEDY, J.); *cf.* Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact' ").

Williams-Yulee v. Fla. Bar, 575 U.S. 433 (2015).

Daytona Beach intentionally prepared a solicitation Ordinance in which predicate clauses stated compelling state interests (unlike most, if not all, panhandling ordinances scrutinized after Reed) and created a legislative record which demonstrated both the compelling government interests in regulating panhandlers and the fact that the least restrictive means of regulation was selected.

The effort to survive even strict scrutiny appears to be unique among reported

39

cases as local governments have generally conceded that their regulations cannot meet that standard. *Compare*, Henagan v. City of Lafayette, 2022 WL 4546721 at *2 (W.D. La. Sept. 27, 2022) (City waived its right to challenge the level of scrutiny to be applied and had neglected to explain how the law could survive even intermediate scrutiny); Homeless Helping Homeless, Inc. v. City of Tampa, 2016 WL 4162882 at *5 (M.D. Fla. 2016) (City conceded that its solicitation law was not supported by a compelling interest and did not employ the least restrictive means).

Preserving the public health is a compelling government interest. *See*, Regents of Univ. of California v. Bakke, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification."); Buchwald v. Univ. of New Mexico Sch. of Med., 159 F.3d 487, 498 (10th Cir. 1998) ("[P]ublic health is a compelling government interest…"); Lawrence v. Polis, 505 F.Supp. 3d 1136, 1144 (D. Colo. 2020) ("Whether it is deemed an 'emergency' or not, responding to a public health threat is undeniably a compelling government interest."). In this case, Daytona Beach introduced testimony from Steven Miles, M.D., a knowledgeable and experienced physician, about the link between panhandling, open defecation and urination and the spread of diseases which can cause severe disease and death:

> 12.    Assuming, as I was asked to do, that the evidence is going to show that panhandlers openly defecate and openly urinate, my conclusion is that exposure to such open defecation or urination in the City of Daytona Beach, including but not limited to the Boardwalk, would be significantly detrimental to the health of citizens and tourists, especially the old, young, and infirm.

> 13.    I have reviewed the ordinance and its regulations on panhandlers and at the time of the passage of the subject ordinance I recommended that considering the effect on the public health safety and welfare of the citizens and tourists of Daytona Beach, the City Commission should strongly consider passing the ordinance because if not, we're going to have an outbreak or problem.

(Doc. 44-5 at 3, ¶¶12-13). Dr. Miles' opinion was supported by medical literature documenting the diseases addressed in his Declaration. (Doc. 20-3). In addition, the unique link between panhandling and open defecation and urination was supported by numerous witnesses, including police officers, the fire chief, fire personnel, public workers, business owners and employees. (Doc. 44-3 at 4; 44-4 at 3-4; Doc. 73-1 at 3-5). Plaintiffs introduced no evidence to contradict either the existence or compelling nature of these proofs.

Without identifying any flaws in Dr. Miles' credentials, or itemizing any gaps in the City's evidence, the trial Court simply rejected Dr. Miles' testimonial evidence which was based in part on comprehensive medical studies:

> The general assertion that open urination and open defecation are "habits attributable to panhandlers," § 66-1(a), likewise does not provide justification for these location-based restrictions.

41

(Doc. 72 at 12). The Court's ruling finding is contrary to the record as well as the general deference traditionally shown to medical professionals:

> The Court is mindful that medical experts, including medical experts on the White House Coronavirus Task Force, have recommended that the County keep its curfew in place to help stem the spread of COVID-19. As stated above, when officials "undertake to act in areas fraught with medical scientific uncertainties, their latitude must be especially broad. Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary." South Bay, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring).

7020 Ent., LLC v. Miami-Dade Cnty., 519 F.Supp. 3d 1094, 1109 (S.D. Fla. 2021).

The City also identified traffic and pedestrian safety as a compelling interest served by its panhandling Ordinance. (Doc. 44 at 17-18). *See, generally*, Gbalazeh v. City of Dallas, Texas, No. 3:18-CV-0076-N, 2019 WL 1569345 at *2 (N.D. Tex. 2019) ("Traffic safety qualifies as a compelling government interest. *See*, *e.g.*, McLaughlin v. Lowell, 140 F.Supp. 3d 177, 190-91 (D. Mass. 2015); City of Baton Rouge, 876 F.2d at 497-98 (*citing* Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640 (1981).");  *See, also*, Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1268 (11th Cir. 2005) ("We do not foreclose the possibility that traffic safety may in some circumstances constitute a compelling government interest…").

It is no great stretch to imagine that individuals regularly approaching cars at busy intersections expose themselves and drivers to risks of death or serious injury

the amelioration of which are significant government interests:

> 5.    One of the effects that I have seen of panhandling on the City of Daytona Beach is that panhandlers interfere with pedestrian safety. Panhandlers have been hit by cars and seriously injured.

> 6. One example is of a panhandler named Kimberly Mason who was a habitual panhandler at Nova and Belleville. She distracted a driver and he did a complete 360 and ran her over on the median and hit two cars next to her.

(Doc. 73-1 at 1-2, ¶¶ 5, 6).

The trial Court did not dispute the fact that traffic safety could rise to the level of a compelling government interest, but discounted Appellant's evidence that § 66-1 furthered these interests:

> Third, the Traffic Provisions are underinclusive in that they restrict solicitations for charity but not solicitations regarding any other subject matter, which would pose the same threat to public safety and deployment of police or fire vehicles. *See* <u>Reed</u>, 576 U.S. at 172

(Doc. 72 at 13). The Court's ruling suffers the fault earlier described because § 66-1 is not limited to charitable solicitations, but applies to all forms of panhandling. In addition, the City's witnesses testified about the dangerous effects unique to panhandling which they personally witnessed. Those included serious injuries from accidents. The legislative record also includes testimony concerning the aggressive conduct of many panhandlers when they approached motor vehicles. (Doc. 73-1 at 1-2; 44-6 at 2-3).

43

In considering the issue of narrow tailoring, the trial Court did not appear to have distinguished between the standards applicable to intermediate scrutiny and those utilized for strict scrutiny. The words "least restrictive means" never appear in the injunction order, although that it is universally known that this is the standard applicable to strict scrutiny cases. *See, generally*, Americans for Prosperity Found. v. Bonta, 594 U.S. __, 141 S. Ct. 2373, 2383 (2021) *quoting* McCullen v. Coakley, 573 U.S. 464, 478 (2014) ("Under strict scrutiny, the government must adopt "the least restrictive means of achieving a compelling state interest…").

Section 66-1 does, in fact, adopt the least restrictive means of regulation. Panhandling is regulated in the community, but is permitted in 97.5% of the City, including many busy roads and commercial areas. The temporal restrictions are limited to nighttime hours when solicitation is rare and dangerous conditions exist. *Compare*, Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1365 (11th Cir. 1999) ("Since the rule also leaves open reasonable alternative avenues of expression - adult businesses may stay open fourteen hours a day, seven days a week - it is valid."). The only restriction on manner pertains to specifically defined "aggressive" panhandling, which addresses conduct rather than speech including conduct that is tantamount to assault.

Two additional points should be noted with respect to the "least restrictive

means" of regulation. First, the City reviewed the experiences of a nearby community (St. Augustine) with a similar ordinance and calibrated its own law in light of those experiences. (Doc. 20-5 at 172-173; 20-10; 20-11; 20-12; *See, also*, Doc. 20-5 at 83-84, 93-97). Second, the Plaintiffs never suggested that any other kind of regulation would be sufficient to address the City's legitimate interests. Rather, they take the maximal position that no restrictions are permissible on panhandlers under any circumstances. The Plaintiffs' extreme position runs contrary to the Supreme Court's observation in <u>Austin</u> that solicitation ordinances are fully consistent with the First Amendment. <u>Austin</u>, 596 U.S. 61 at 72.

Daytona Beach's solicitation Ordinance has asserted compelling state interests in its predicate clauses and has more than amply supported them in its comprehensive legislative record. Section 66-1 can satisfy the extraordinary burdens imposed by <u>Reed</u>, although it should be governed by the lesser burdens adopted by <u>Austin</u>.

> **D.    THE EQUITIES FAVOR THE MAINTENANCE OF DAYTONA BEACH'S SOLICITATION ORDINANCE GIVEN THE VITAL PUBLIC INTEREST IN REGULATION AND CONSIDERING THE LIKELIHOOD THAT PLAINTIFFS' CONSTITUTIONAL CLAIMS WILL NOT SUCCEED WHEN REVIEWED UNDER <u>AUSTIN</u>.**

Daytona Beach has shown that it is likely to succeed on the merits of this

case. The trial Court misconstrued and disregarded the impact of the <u>Austin</u> decision on the over-reaching earlier decision in <u>Reed</u>. <u>Austin</u> plainly says that solicitation ordinances are not content based so long as they do not discriminate between speakers.  Therefore, solicitation ordinances should be subject to intermediate review and not strict scrutiny. <u>Austin</u>, 596 U.S. 61 at 72. While preservation of First Amendment rights is of upmost importance in our democracy, § 66-1 does not substantially interfere with Plaintiffs' right to speak, including the ability to panhandle. Even with the Ordinance in effect, Plaintiffs are free to panhandle in a vast swathe of land available for solicitation in Daytona Beach and can engage in advocacy anywhere.

In contrast, the present injunction Order severely constrains the City's ability to address government interests which the trial Court itself suggested are substantial and some of which should be found to be compelling. (Doc. 72 at 10-11). In particular, the City has demonstrated a compelling link between unregulated panhandling and disease as well as the obvious risk of serious injury or death posed to pedestrians and drivers, alike. The City's compelling interest in protecting the safety of the public supersedes the minimal burden placed on Plaintiffs' speech rights:

> In exercising their sound discretion, courts of equity should pay
> particular regard for the public consequences in employing the

extraordinary remedy of injunction. <u>Railroad Comm'n. v. Pullman Co.</u>, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). Thus, the Court has noted that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." (citation omitted).

<u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312–13 (1982).

## II.    THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO CONDUCT AN EVIDENTIARY HEARING.

The trial Court abused its discretion when it refused to conduct an evidentiary hearing in this matter despite the City's detailed request for a hearing and the bitterly contested and substantial factual issues presented by the Appellant. (Doc. 45). The District Court believed that there was no reason to conduct a hearing because the City offered no good reasons for having one:

> Having reviewed the parties' submissions, the Court finds that Defendant has failed to state with sufficient particularity any material issue of fact or credibility determinations necessitating an evidentiary hearing.

(Doc. 72 at 6). The Court's ruling is egregiously erroneous. In fact, as also set forth hereinabove, the City provided a dozen categories of fact which were in dispute and which would benefit from a hearing:

47

a.     The physical geography and demographics of where the Plaintiff's solicitations occur.

b.     When the Plaintiffs' solicitations occur.

c.     The alternative avenues of communication available under the subject Ordinance.

d.     The manner in which Plaintiffs solicit at intersections.

e.     The nature of the medians subject to the City's regulations and the manner in which the Plaintiffs solicit in those medians.

f.     Whether Plaintiffs' solicitations are intended solely for commercial purposes or whether their solicitations include a non-commercial message likely to be understood by others.

g.     Whether the Ordinance substantially burdens Plaintiffs' speech given the abundant alternative avenues provided and, if so, what specific aspects of the Ordinance burden what specific aspects of Plaintiffs' speech.

h.     Whether Plaintiffs intend to engage in "aggressive panhandling" and whether Daytona Beach's ban on such conduct has any effect on Plaintiffs' speech.

i.     The details and substance of the sworn statement and testimony of Dr. Steven Miles in support of a compelling state interest.

j.     The details and substance of the sworn statements and testimony of Bellanca, Harwick, Kosinski, Pierelli, Ross and Thomas concerning the effects that they have witnessed of panhandling in Daytona Beach prior to and after the passage of the subject Ordinance.

k.     The substance and relevance of the sworn statement and testimony of John Clary, head of the intellectual property division of Daytona Beach when the subject Ordinance was enacted, regarding the percentage (in terms of acreage) of Daytona Beach available for

panhandling. after application of the distance parameters of the subject Ordinance.

l.      The details, substance and relevance of each of the Plaintiffs' sworn statements and the credibility of the Plaintiffs regarding their sworn statements and the complaint.

(Doc. 45 at 4-6).

Plaintiffs submitted affidavits which contradicted many of these facts, including where and when the Plaintiffs engaged in solicitations[16] and issues of narrow tailoring and alternative avenues of communication. (Doc. 39-1; 39-2; 39-3; 39-4; 39-5; 39-6; 39-7). In their brief, the Plaintiffs question the City's claims that solicitations for immediate donations of money adversely affected the public health and safety. Plaintiffs refer to those interests as a "pretense". (Doc. 39 at 3).

While District Judges have some discretion to decline to conduct an evidentiary hearing, that discretion is limited to circumstances where the facts are not "bitterly contested" as they were here and in All Care Nursing Serv., Inc.:

> Furthermore, the trial court abused its discretion in failing to hold an evidentiary hearing in this case. An evidentiary hearing is not always required before the issuance of a preliminary injunction. Baker v. Buckeye Cellulose Corp., 856 F.2d at 169. Where the injunction turns on the resolution of bitterly disputed facts, however, an evidentiary hearing is normally required to decide credibility issues. Forts v. Ward, 566 F.2d 849, 851 (2d Cir. 1977); see, also, Commerce Park at DFW

---

[16] These factual details reflect directly on some of the legal issues such as whether the Plaintiffs had standing to challenge the prohibitions against "aggressive panhandling" and solicitations after dark.

<u>Freeport v. Mardian Construction Co.</u>, 729 F.2d 334, 341 (5th Cir. 1984). The extent to which a court is required to take oral testimony in a hearing on a motion for a preliminary injunction, and the extent to which it may rely upon affidavits reflect a tension between the need for speedy action and the desire for certainty and complete fairness. <u>SEC v. Frank</u>, 388 F.2d 486, 490 (2d Cir. 1968). In the case *sub judice,* the trial court granted the preliminary injunction based on the various conflicting affidavits and exhibits submitted by the parties and the abbreviated oral arguments of counsel. The conflicting affidavits placed in serious dispute issues central to appellees' claims. … In this complex antitrust action, where much depends upon the accurate presentation of numerous facts, the trial court erred in not holding an evidentiary hearing to resolve these hotly contested issues.

<u>All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.</u>, 887 F.2d 1535, 1538–39 (11th Cir. 1989); *See, also*, <u>Florida Atl. Univ. Bd. of Trustees v. Parsont</u>, 465 F.Supp. 3d 1279, 1288–89 (S.D. Fla. 2020) *quoting* <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1312 (11th Cir. 1998)  ("[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue,' district courts must hold an evidentiary hearing on the propriety of injunctive relief.").

Likewise, it is an abuse of discretion for a trial Judge to resolve conflicting issues of fact without holding a hearing to weigh those facts. *See*, <u>CBS Broad., Inc. v. EchoStar Communications Corp.</u>, 265 F.3d 1193, 1207 n. 18 (11th Cir. 2001) ("Had the court held an evidentiary hearing, it would have been free to discount Hawkins' statements as uncredible. However, on the face of Hawkins' affidavits and

the Networks' arguments, the court was not at liberty to make such a credibility determination or inferential leap on this contested issue without the benefit of an evidentiary hearing."); *See, also*, <u>Moon v. Med. Tech. Associates, Inc.</u>, 577 Fed. Appx. 934, 936 (11th Cir. 2014) (*Citing* <u>CBS</u> for same proposition).

The failure to conduct an evidentiary hearing in this case was an abuse of discretion for multiple reasons:

1.    The City of Daytona Beach identified twelve categories of facts that were in dispute and which would require resolution at a hearing, including fundamental issues pertaining to standing.[17]

2.    After the City identified contested facts, it submitted affidavits which supported its version of the facts and the inferences to be drawn from them. The Plaintiffs submitted their own affidavits which contradicted Daytona Beach's position. When faced with conflicting affidavits on key factual points, the District Court is precluded from resolving those disputes without conducting an evidentiary hearing.

3.    Issues of credibility are at play. They include the assessment of Daytona Beach's medical testimony that the risk of disease from the open defecation often

---

[17] The trial Court suggested that the City had failed to specifically identify any disputed factual issues. However, that finding is itself clearly erroneous.

accompanying panhandling is dramatically increased when there is a personal exchange of money: the precise target of the solicitation Ordinance.

4.     The parties have engaged in extensive discovery which has also included hearings, depositions  and rulings on their respective motions for protective orders. (Doc. 53, 57, 59, 61, 63, 68, 84, 89, 96). At a minimum, the intensive and contentious discovery should have alerted the District Judge to the reality that many key facts in this case were hotly contested.

5.     This case presents a constitutional question of first impression: are solicitation ordinances governed by the strict analysis adopted by <u>Reed</u>, or has the <u>Reed</u> standard been significantly modified by <u>Austin</u> as the City contends and as the *dicta* in <u>Austin</u> and opinions in subsequent cases hold? The trial Court entered its injunction without the benefit of oral argument on this crucial constitutional question.

6.     The City of Daytona Beach has identified at least two instances where the District Court simply misconstrued the solicitation Ordinance: first in finding that the Ordinance only regulated charitable solicitations; and second in finding that the supposedly undefined term "panhandling" invited extensive statutory construction. Had the trial Judge conducted a hearing and considered argument on these issues, or had the Judge asked appropriate questions to test the Court's

conclusions, those errors may have been avoided.

Given the disputed facts and the status of this case as one of first impression in this Circuit in the post-Austin environment, the trial Court abused its discretion when it denied Appellant's request for an evidentiary hearing (as well as Appellees' request for oral argument).

## CONCLUSION

Daytona Beach's panhandling ordinance is a content-neutral means of addressing a compelling problem faced by many local governments. In past years, similar ordinances were universally stricken in reliance on the Supreme Court's decision in Reed, which treated any law requiring the examination of what a speaker says as intrinsically content-based and subject to strict scrutiny. The Supreme Court receded from Reed in Austin. In Austin, the Court specifically stated that solicitation ordinances are *not* content-based so long as they do not discriminate based on topic, subject matter, or viewpoint. In other words, regulating a category of speech, such as solicitations, does not automatically subject a law to strict scrutiny.

Daytona Beach's Ordinance does not turn on topic, subject matter or viewpoint. Instead, *all* persons seeking an immediate donation of money or other item of value are subject to the regulation regardless of who they are, what they say or the purpose of the solicitation. Accordingly, § 66-1 is subject to intermediate

scrutiny, which it easily satisfies. Indeed, the law is supported by a record that would survive strict scrutiny. The preliminary injunction must be reversed because the District Judge applied an incorrect standard and failed to conduct a hearing to evaluate the Appellant's key evidence.

*Respectfully submitted,*

  /s/ Michael H. Kahn
Michael H. Kahn, Esquire
Florida Bar No.: 0241921
MICHAEL KAHN, P.A.
482 N. Harbor City Blvd.
Melbourne, FL 32935
(321) 242-2564
Lead Counsel for Defendant
The City of Daytona Beach, Florida
Michael@michaelkahnpa.com
Roma@michaelkahnpa.com
Assistant@michaelkahnpa.com
*Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this Brief contains 12,849 words, excluding the parts of the Brief exempted by Fed.R.App.P. 32(f) and Eleventh Circuit Rule 32-4.

This Brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using MS Word 2013 in Times New Roman 14 point font.

  /s/  Michael H. Kahn
Michael H. Kahn, Esquire
Florida Bar No.: 0241921

## CERTIFICATE OF SERVICE

I certify that on December 5, 2023, pursuant to Fed. R. Civ. P. 31, I electronically filed this certificate with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.

  /s/  Michael H. Kahn
Michael H. Kahn, Esquire
Florida Bar No.: 0241921